Filed 5/5/25  P. v. Medina CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MIGUEL ANGEL MEDINA,<br><br>    Defendant and Appellant. | H051661<br>(Monterey County<br> Super. Ct. No. 23CR004036) |

Following a jury trial, defendant Miguel Angel Medina was convicted of second degree robbery (Pen. Code, § 211)[1] and conspiracy to commit that crime (§ 182, subd. (a)(1)).  Finding the conviction was Medina's third strike, the trial court sentenced him to prison for 25 years to life.  In this appeal, Medina contends the trial court erred by: (1) admitting hearsay statements attributed to his unavailable alleged accomplice; (2) failing to declare a mistrial after a law enforcement witness implied that Medina was either a gang member or a sex offender; and (3) finding that Medina's prior convictions were strikes without evaluating whether Medina's underlying conduct would support a conviction under section 186.22 as amended.  We will affirm the judgment.

---

[1] Undesignated statutory references are to the Penal Code.

## I.  BACKGROUND

### A.  *The Information*

In the operative first amended information, the Monterey County District Attorney charged Medina with (1) second degree robbery (count 1, § 211); (2) conspiracy to commit second degree robbery (count 3, § 182, subd. (a)(1)); and (3) possession of a firearm by a felon (count 2, § 29800, subd. (a)(1)).  That information included an allegation that Medina had two prior convictions qualifying as strike offenses (§§ 667, subd. (d), 1170.12, subd. (b)) because they were associated with gang activity:  (1) a 2015 conviction for vehicle theft (Veh. Code, § 10851) with a gang enhancement (§ 186.22, subd. (b)(1)); and (2) a 2018 conviction for participation in a criminal street gang (§ 186.22, subd. (a)).  The information further alleged circumstances in aggravation.

### B.  *Trial Evidence*

John Doe had been acquainted with Medina since Doe was in middle school, as Medina's older brother was one of Doe's middle school friends.  After a night drinking on the town with Medina, Doe was beaten and robbed in his home.  Doe's testimony, corroborated by Medina's parole-mandated GPS tracking monitor and an accomplice's declaration against interest, implicated Medina in the robbery.

#### 1.  *Doe's Testimony*

Doe encountered Medina by chance in downtown Salinas.  Outside Bankers Casino, Medina asked to borrow $50, which Doe lent him from a $5,000 wad of cash.[2] Medina lost the $50 gambling and asked Doe for more, this time more "demanding." When Doe was ready to leave, he was drunk enough that another friend was hailing him an Uber, but Medina offered Doe a ride instead.

---

[2] Surveillance video from Bankers Casino showed Doe and Medina arriving together, having both visited separately earlier in the evening.

Medina walked Doe to another bar, where he said a girl there would drive Doe home. On the way to the bar, Medina lifted his hoodie to display a black handgun with an extended clip in his waistband, which made Doe feel uneasy. At the bar, Medina introduced Doe to Sasshay Brooks. Doe recognized Brooks from high school and had no qualms about accepting a ride from her. Medina also showed Doe the gun again and offered to sell it to him.

Brooks drove Doe and Medina to Doe's apartment, stopping en route at a liquor store for more alcohol. Brooks asked to use Doe's bathroom, so Doe let Brooks and Medina into his apartment.

Doe grew nervous about Medina and Brooks lingering there, so he agreed to buy Medina's gun. As Doe was unloading the gun, Brooks wrestled it out of his hands and struck him with it several times, leaving him concussed and bleeding heavily.[3] Dazed but conscious, Doe heard Medina tell Brooks to shoot him and saw Medina and Brooks grab his possessions. They fled, taking Doe's PlayStation 5, Gucci slides, cell phone, and cash.

### 2.   *GPS Monitoring*

Medina was subject to GPS ankle monitoring as a parolee. The GPS data showed that Medina's movements that night were consistent with Doe's account of his movements between the casino, the bar, the liquor store, and Doe's apartment. And the GPS data were consistent with Medina's leaving Doe's apartment by car just after the robbery, returning to Medina's home near the casino in downtown Salinas.

---

[3] An emergency room doctor testified that he administered staples to close three lacerations on Doe's head. He said that Doe also had a concussion, three hematomas on his scalp, and a hematoma on his left arm.

### 3. *A.A.'s Testimony*

Doe told his older sister A.A. about the robbery and Brooks's involvement. A.A., who also knew Brooks, was upset and wanted to ask Brooks why she had done that to Doe. So A.A. spoke to Brooks numerous times over three days.[4]

Brooks told A.A. that she had not realized the night of the robbery that Doe was A.A.'s brother. Brooks and "Miguel" planned the robbery after seeing Doe "showing off money." Brooks said the robbery took place in Doe's home after Brooks had driven him there with "Miguel." Brooks hit Doe in the head with a gun and took a PlayStation 5 and money.

Brooks returned Doe's PlayStation 5 and some money to A.A. Brooks apologized and said that "Miguel" took the rest of the money.

### 4. *Doe's Inconsistent Statements*

After the robbery, Doe made statements that were inaccurate, inconsistent with other contemporaneous or subsequent statements, or inconsistent with the physical evidence; these statements concerned subjects including the types of alcohol he consumed, the sex of his assailants, who struck him, the number of times he was struck, and whether he lost consciousness during the attack.

### C. *Verdict, Prior Strikes, Sentencing, and Appeal*

The jury found Medina guilty of second degree robbery (count 1) and conspiracy to commit second degree robbery (count 3), but not guilty of possession of a firearm by a felon (count 2). After a bench trial, the trial court found that Medina had been convicted of two prior strikes as alleged by the prosecution.

---

[4] Cell phone records confirmed that A.A. first spoke to Brooks the evening after the robbery, with many calls between them over the next two days.

After denying Medina's motions for a new trial and dismissal of the prior strike allegations, the trial court sentenced Medina to prison for 25 years to life on each count of conviction, with the sentence for count 3 stayed under section 654.

Medina timely appealed.

## II. DISCUSSION

### A. *Brooks's Statements*

Medina claims that the trial court erred in admitting over his objection A.A.'s testimony about Brooks's confessed participation in the robbery. He contends that Brooks's statements to A.A. are inadmissible hearsay, both in toto and in her statements inculpating Medina. Medina also asserts that Brooks's statements are so unreliable that their admission violated his due process rights under the Fourteenth Amendment. Reviewing for abuse of discretion (see *People v. Chhoun* (2021) 11 Cal.5th 1, 44 (*Chhoun*)), we conclude the court properly admitted most of Brooks's statement to A.A.—including Brooks's account of robbing Doe with an accomplice—as a declaration against interest (Evid. Code, § 1230). To the extent the court should have precluded A.A. from testifying that Brooks identified Medina as her coconspirator, any error in admitting this hearsay identification was harmless, because Medina was known to Doe and the GPS and surveillance video evidence otherwise confirmed Doe's identification of Medina.

"Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability . . . , or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true." (Evid. Code, § 1230.)

A single statement may serve multiple purposes—a declarant may inculpate herself, exculpate herself, and exculpate others in short order. "The exception to the

5

hearsay rule codified in Evidence Code section 1230 does not apply ' "to evidence of any statement or portion of a statement not itself specifically disserving to the interests of the declarant." ' " (*People v. Jasso* (2025) 17 Cal.5th 646, 669 (*Jasso*).) But a statement is not made inadmissible as a " ' "collateral assertion[,]" ' " if it is " 'inextricably tied to and part of a specific statement against [the declarant's] penal interest.' [Citation.] Whether a statement is a collateral assertion not properly admitted as a declaration against penal interest depends not on whose actions it describes, but rather on whether it is an integral part of a statement that inculpates the declarant." (*Id.* at p. 671; see also *People v. Grimes* (2016) 1 Cal.5th 698, 716 (*Grimes*) [the trial court need not "sever and excise any and all portions of an otherwise inculpatory statement that do not 'further incriminate' the declarant"].)

There is no dispute that Brooks, having refused to testify, was unavailable at trial. (See *Chhoun*, *supra*, 11 Cal.5th at p. 47.) Nor is there any dispute that Brooks's admissions to hitting Doe over the head with a gun and taking his PlayStation were self-inculpatory. Medina's focus is the extent to which Brooks's statements to A.A. were so contrary to her relevant interest as to be reliable enough to admit. He contends that because Brooks knew that Doe already knew the facts she admitted to A.A., Brooks gave up nothing of value. Medina asserts that these worthless admissions were the grain of truth intended to make Brooks's efforts to excuse herself by implicating Medina more believable. To that end, Medina argues that three statements that were admitted at trial, and one that was not, tend to exculpate Brooks or help her curry favor with A.A.: (1) Brooks and Medina agreed to rob Doe; (2) Medina was present when Brooks attacked Doe; (3) Brooks was unable to return all of the money because Medina had taken some of it;[5] and (4) per the excluded statement, Brooks hit Doe because she was afraid Medina

---

[5] Medina interprets A.A.'s recitation of Brooks's statements as indicating that Medina, not Brooks, took money from Doe's apartment. But on direct examination A.A. testified that Brooks admitted taking money from the apartment but only returned a

would otherwise " 'do something worse.' " We identify no prejudicial error in the trial court's exercise of its discretion.

Under our deferential standard of review, we reject Medina's contention that the entirety of Brooks's statement was untrustworthy because she was attempting to shift blame and curry favor. (See *People v. Duarte* (2000) 24 Cal.4th 603, 615 (*Duarte*).) The trial court could reasonably have interpreted the overall thrust of Brooks's statement as fully inculpating herself, without shifting blame to another, as means of persuading A.A. of the sincerity of Brooks's remorse. (See *Jasso*, *supra*, 17 Cal.5th at p. 670 [the trial court is entitled to draw reasonable conclusions about the declarant's motivations from the circumstances surrounding the statements]; see also *Grimes*, *supra*, 1 Cal.5th at pp. 717–719 [considering declarant's motivations in context].) Although Brooks had an interest in avoiding prosecution, confessing her guilt to A.A. did not of itself further that interest. And while Doe already knew of Brooks's participation in the robbery and had disclosed it to A.A., we cannot say that Brooks's confirmation of Doe's account did not further inculpate her: Assuming Brooks merely corroborated Doe's account, the trial court could reasonably infer that Brooks knew enough of Doe's inebriation when he was robbed to recognize that her corroboration of Doe's account to A.A. incriminated her further.

*Duarte* is readily distinguishable. There, an accomplice spoke to police after his apprehension, attributing "the idea of doing a drive-by shooting" to the defendant, described the motive as retaliation for a drive-by shooting by a gang member that had

---

PlayStation, saying "that she didn't have the money because Miguel had taken that money. She only took the PlayStation, according to her." A.A. then clarified that Brooks had returned "some money." On cross-examination, A.A. confirmed that Brooks admitted taking money from Doe. So Brooks told A.A. that she took money from Doe, but never specified from whom "Miguel had taken that money." Put differently, Brooks did not say whether Medina took money from the apartment or took the money from her after she took it from the apartment.

targeted the defendant, disclaimed any knowledge about the procurement of firearms for the commission of the drive-by shooting, attributed the decision to target a residence at which the alleged gang member did not reside to bad directions given by an unidentified third accomplice who drove the car, and said that while the defendant fired an assault rifle at the residence, the declarant fired at the roof to ensure that nobody got hurt. (*Duarte*, *supra*, 24 Cal.4th at pp. 615–616.) These were unmistakable " 'attempts to shift blame or curry favor' " (*id*. at p. 615) "made to police shortly after [the declarant] had been apprehended" (*id*. at p. 617) in which, "from start to finish, . . . [the declarant] evidently was 'trying to fasten guilt' on others, including defendant, while 'keeping his own skirts as clean as possible' " (*Id*. at p. 616.)

Here, in the statements as described in A.A.'s trial testimony, Brooks admitted deciding to rob Doe without minimizing her role in reaching that decision, beating Doe with the gun, and taking his PlayStation and his money, but attributed nothing to Medina other than sharing in the decision to commit robbery and his presence in Doe's apartment as Brooks beat him, and his retaining the bulk of the cash proceeds. There is no serious dispute that Brooks's hope was to avoid prosecution by expressing remorse and returning what she said she could of the stolen goods. The trial court could reasonably conclude that Brooks's strategy in speaking with A.A. was to deter prosecution by contrition and restitution rather than denial and that Brooks would not have made these admissions and her general narrative admitting her responsibility[6] " 'if they weren't true.' " (*Duarte*, *supra*, 24 Cal.4th at p. 618.)

---

[6] To be sure, Brooks's statement, described only in the prosecution trial brief, that she hit Doe because she was afraid of what Medina might otherwise do is reasonably understood as an attempt to excuse her infliction of serious injury in robbing Doe. But not only does this aspect of Brooks's statement have the virtue of being consistent with Doe's testimony that Medina urged Brooks to shoot him, it more importantly was not admitted at trial.

The trial court could reasonably have concluded that Brooks's admission to planning the robbery with another person further inculpated her, rather than shifted the blame to her accomplice. Medina contends that it is "common[ ]sense" that robbing Doe alone would be more blameworthy than conspiring to rob Doe with an accomplice. (See *Grimes*, *supra*, 1 Cal.5th at p. 718.) But *Grimes* merely referred to a "commonsense notion that killers who act on their own are likely to be punished more severely than those who were encouraged or assisted by a confederate, or who played some lesser role in the act." (*Ibid*.; see also *Duarte*, *supra*, 24 Cal.4th at pp. 615–616 [describing attempt to shift blame by attributing the idea of the crime to another person].) And, as described in A.A.'s trial testimony, Brooks did not say that the idea to rob Doe originated with her accomplice or describe any inducement or direction by an accomplice; she described her role in planning and carrying out a robbery.

Planning a robbery in advance and initiating it with a coconspirator present, rather than acting alone on a spur of the moment impulse, can reasonably be understood to make Brooks's conduct more blameworthy than less. Circumstances in aggravation in California include that "[t]he manner in which the crime was carried out indicates planning, sophistication, or professionalism" and that the "defendant induced others to participate in the commission of the crime or occupied a position of leadership or dominance of other participants in its commission." (Cal. Rules of Court, rule 4.421(a)(8), (4).) We do not suggest that Brooks had intimate familiarity with California sentencing law at the time she spoke to A.A., merely that reasonable minds may differ as to where Brooks's statements fall on the spectrum from self-inculpatory to blame shifting when Brooks said she conspired with Medina to rob Doe before physically attacking Doe with her coconspirator present. The trial court did not abuse its discretion in treating those statements as self-inculpatory, rather than efforts to exculpate herself or curry favor.

9

And reviewing for abuse of discretion, we are not persuaded by Medina's theory that Brooks admitted what she knew Doe knew to enable herself to credibly shift blame to her accomplice. To the extent Medina is suggesting that Brooks knew Doe remembered that Brooks attacked him in his apartment but could not remember whether Medina was present at the time, that suggestion is mere speculation. And as we have explained admitting to a conspiracy without attributing the inspiration to her accomplice can reasonably be understood to increase rather than decrease Brooks's blameworthiness.

Nor are we persuaded that this testimony was inadmissible under federal principles of due process. Medina highlights language suggesting that otherwise admissible hearsay might be rendered inadmissible by constitutional due process requirements if it is "unreliable." (*Michigan v. Bryant* (2011) 562 U.S. 344, 370, fn. 13.) Citing the plurality opinion in *Lilly v. Virginia* (1999) 527 U.S. 116, 131, Medina asserts that Brooks's statements are presumptively unreliable as an accomplice's confession that incriminates a defendant. *Lilly* harkens to a bygone time when reliability was "the touchstone for determining violations of the confrontation clause" (*People v. Almeda* (2018) 19 Cal.App.5th 346, 362), so it does not directly support Medina's due process argument. But accepting the premise that the reliability discussion in *Lilly* can be transposed to a due process challenge, Medina's reliability argument merely restates his state law hearsay objection—Brooks's statements are unreliable because she shifted blame from herself to her accomplice. (See *Lilly*, at pp. 131–134.) We reject Medina's due process argument that the statements were unreliable—the statements are only admissible under state law if the trial court determined, in a proper exercise of its discretion considering all of the circumstances, that the statements are reliable. (See, e.g., *Grimes*, *supra*, 1 Cal.5th at pp. 716–717.)

Brooks's statement, when she returned Doe's property to A.A., that she did not have all of Doe's money because Medina "had taken it" is not an attempt to shift blame for the crime, but to explain why she cannot return more of the money she participated in

10

stealing.[7]  Brooks thereby admits that the amount of money she participated in stealing is greater than the amount she is presenting, a fact that inculpates her for the original crime. A reasonable person in Brooks's position would not have admitted that the stolen sum exceeded the returned sum without believing the fact to be true.  (See *Grimes*, *supra*, 1 Cal.5th at p. 716.)  But Brooks's attempt to blame Medina for her inability to make full restitution is the sort of statement that Brooks might reasonably have made even if she did not believe it to be true—such as if she had kept or spent some of the money herself. Even if we assume this portion of the statement could have been excised, we will explain below that its inclusion was harmless.

Finally, we will assume the trial court erred by overruling Medina's objection to Brooks's naming "Miguel" as her coconspirator/coprincipal in the robbery.  The identification of her coconspirator did not increase Brooks's blameworthiness.  (See *Jasso*, *supra*, 17 Cal.5th at p. 671 [collateral assertion is a statement or portion of a statement not specifically disserving to the declarant's interests and not inextricably tied to and part of a specific statement against the declarant's penal interest]; see also *Grimes*, *supra*, 1 Cal.5th at p. 717 [considering whether statements minimized "responsibility or shift[ed] blame to others"].)  Nor is the identification otherwise against Brooks's interest such that a reasonable person in Brooks's position " 'would not have made the statement unless [s]he believed it to be true.' "  (See *Grimes*, at p. 716.)  A person confronted with and admitting their own culpability might still falsely identify their accomplice for a host of reasons.

But any error in admitting Brooks's testimony that "Miguel" was the accomplice who was present during the robbery and kept some of the stolen money was harmless under any standard.[8]  Even without identifying "Miguel," Brooks's statements supported

_____

[7] Medina did not object to this evidence when it was admitted at trial.

[8] Having invoked reliability as a requirement of federal due process, Medina argues that any error is prejudicial unless the prosecution can prove beyond a reasonable

11

the inference that Medina and Brooks agreed to rob Doe before carrying out the robbery. This helped corroborate Doe's testimony, which was also corroborated by GPS data from Medina's ankle monitor. Although Doe's recall and credibility were disputed, he had long known Medina, and the GPS monitoring data strongly supported the inference that Medina participated in the robbery. And the record discloses no reason for Doe to falsely accuse Medina. Brooks's statements about "Miguel['s]" participation and the distribution of the loot provide further support for the allegation of conspiracy, but its weight pales in comparison to the other evidence of their coordinated movements—Doe's testimony, the GPS monitoring data, and Brooks's admissible declarations against her own penal interest.

**B.** *Mistrial*

Medina contends that the trial court violated state law and his federal due process rights by refusing to declare a mistrial after a law enforcement witness volunteered that Medina was subject to ankle monitoring because he was either a sex offender or a gang member. " ' " 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]' [Citation.] A motion for mistrial should be granted when ' " 'a [defendant's] chances of receiving a fair trial have been irreparably damaged.' " ' " ' " (*People v. Dalton* (2019) 7 Cal.5th 166, 240 (*Dalton*).) Here, the trial court permissibly exercised its discretion by addressing the testimony through curative instructions, rather than declaring a mistrial.

doubt that the verdict was unattributable to the error under *Chapman v. California* (1967) 386 U.S. 18. The Attorney General responds that the state court did not violate due process in the first place unless the improper evidence rendered Medina's trial fundamentally unfair. (See *People v. Jablonski* (2006) 37 Cal.4th 774, 805.) Even under Medina's preferred standard, we are satisfied that Brooks's reference to Medina taking the money did not prejudice Medina.

**1.** *Additional Background*

Before trial, the trial court maintained that, unless Medina testified, the probative value of his gang membership was "substantially outweighed" by its prejudicial effect. But the trial court permitted testimony that Medina was a parolee to explain the use of a GPS-enabled ankle monitor, and Medina's status as a convicted felon was a stipulated fact relevant to the charge for possession of a firearm by a felon.

Bryan Nakayama, a parole agent employed by the California Department of Corrections and Rehabilitation, testified about Medina's GPS monitoring data and generally about the GPS ankle monitoring system. Early in Nakayama's testimony, the prosecutor asked about his "training . . . regarding GPS monitoring." Nakayama responded, "With GPS monitoring we will supervise . . . the parolees [who] are on the monitor, which are sex offenders and gang members, and review their day-to-day movement and investigate." Defense counsel asked to approach and, once the jury was excused from the courtroom, moved for a mistrial.

Defense counsel argued that Medina was incurably prejudiced because the testimony identified Medina as either a gang member or sex offender. The prosecutor offered to ask Nakayama "whether anybody on parole is subject to a GPS monitoring, which [the prosecutor believed would] be confirmed, which [he thought could] unring the bell" without further mentioning gang members or sex offenders. "[W]ith [the] understanding" that the witness would be able "to provide another response that is more general in nature," the trial court reasoned that the issue could be cured. The trial court also invited the parties to suggest a limiting instruction. So the trial court denied the mistrial motion "at th[at] point."

Neither party sought to elicit the curative testimony that the prosecutor had surmised Nakayama might be able to provide. Instead, the trial court included a limiting instruction among its jury instructions. Defense counsel described the rationale for this approach. First, "[i]t did not seem that" testimony "broaden[ing] the class" was going to

come out "cleanly . . . without accentuating this issue." Second, a limiting instruction immediately after the testimony also risked accentuating the issue—it was "more natural" to include the jury instruction with others concerning the jury's review of the evidence.

The trial court instructed the jury as follows: "A witness testified about parolees being on GPS monitoring. You are instructed that many parolees are on GPS monitoring. The GPS monitoring information was introduced for the limited purpose of showing the location by GPS of the device on the given dates. [¶] You may not consider the fact that Mr. Medina was on parole or GPS monitoring in determining his guilt of the charged offense. You are not to speculate in any way as to why Mr. Medina was on GPS monitoring or parole. [¶] Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt."

Separately, the trial court instructed the jury that "certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and no other." And in instructing the jury about the stipulation that Medina had been convicted of a felony during its discussion of count 2, the trial court instructed: "This stipulation means that you must accept this fact as true. Do not consider this fact for any other purpose. Do not speculate or discuss the nature of the conviction."

## 2.   *Whether the Trial Court Acted Within its Discretion*

Medina contends that he was incurably prejudiced by Nakayama's statement that GPS monitoring is used for " 'sex offenders and gang members.' " Medina observes that sex offenses are "highly inflammatory" and " 'evidence of . . . gang membership creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged.' " Medina asserts that the prejudice was incurable because (1) it "directly undermined [his] defense that . . . Brooks was the primary perpetrator and . . . Doe's story was too full of inconsistencies to be reliable"; and (2) the jurors listened to all evidence that followed Nakayama's testimony "with the belief that Mr. Medina was" a "terrifying" sex offender or gang member. And Medina

14

contends that the instruction given was inadequate because the trial court merely instructed the jury not to speculate why Medina was on GPS monitoring or parole; but no speculation was needed to infer that it was because he was a sex offender or gang member.

To be sure, Nakayama's testimony implied that Medina was either a sex offender or a gang member, and this implication risked prejudicing Medina. (See generally *People v. Williams* (1997) 16 Cal.4th 153, 193 [explaining that evidence of gang membership "creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged" and may also have "a highly inflammatory impact"]; *People v. Falsetta* (1999) 21 Cal.4th 903, 916–917 [discussing admissibility of prior sex offenses as propensity evidence].) But the trial court acted within its " ' " 'considerable discretion' " ' " in finding that the risk of prejudice could be cured with a limiting instruction. (*Dalton*, *supra*, 7 Cal.5th at p. 240.)

Courts have upheld rulings denying mistrial motions where the improper evidence was not prejudicial—that is, where it is not reasonably probable that a result more favorable to the defendant would have been reached absent the improper evidence. (See *People v. Welch* (1999) 20 Cal.4th 701, 749–750 [holding that evidence the defendant was a drug dealer was inconsequential given uncontradicted evidence of his guilt, so trial court did not abuse its discretion in denying mistrial even if evidence that defendant was a drug dealer was improper]; *People v. Alexander* (2010) 49 Cal.4th 846, 855, 865, 914–915 [holding that volunteered reference to murder defendant's prior triple murder conviction was not prejudicial where most of the jurors denied hearing the reference and the two that heard it said they could disregard it in their deliberations].) Here, it is not reasonably probable that a result more favorable to Medina would have been reached absent the improper evidence.

Even without the GPS monitoring evidence, the jury knew by the parties' stipulation that Medina had a prior felony conviction. Of course, the trial court forbade

the jury from considering the fact of Medina's prior felony conviction "for any other purpose" than deciding the elements of his firearm possession charge or from speculating about or discussing the nature of the conviction.

And even without what the trial court found to be the witness's unintentional error, the very purpose of Nakayama's testimony was to establish a foundation for the GPS monitoring evidence—that Medina was on parole and subject to continuous location monitoring. Again, the trial court instructed the jury not to consider Medina's parolee status or ongoing GPS monitoring "in determining his guilt of the charged offense." Further, the trial court instructed the jury that GPS monitoring evidence was introduced for the "limited purpose" of showing Medina's location by way of the GPS monitor and that evidence admitted for a limited purpose may be considered "only for that purpose and no other." Without expressly referencing the implication that Medina was a sex offender or a gang member, these instructions forbade the jury from considering Nakayama's testimony to that effect.[9] Given this case-specific context, the risk of prejudice from Nakayama's unsanctioned testimony was curable.

Medina's challenge to the language of the curative instruction is unpersuasive. Without acknowledging the portions of the instruction we have identified above, Medina asserts that the "instruction did not tell jurors to disregard the testimony." While technically true, trial counsel explained that the omission of reference to the testimony was to avoid accentuating it. And the net effect of the instruction was to preclude the jury from relying on testimony about Medina's parole status (including any inferences about the reason he was on parole) in determining his guilt.

---

[9] The trial court's instruction regarding the jury's consideration of the stipulated fact of Medina's prior felony conviction similarly forbade the jury from considering the fact of Medina's prior felony conviction "for any other purpose" or speculating about or discussing the nature of the conviction.

16

So the trial court admitted relevant evidence that alerted the jury to the fact of Medina's criminal history—including his status as a felon and his status as a parolee subject to ankle monitoring—for limited purposes with appropriate instructions. We are focused on the additional fact, volunteered in a tangential remark by a prosecution witness, that Medina's status as a parolee subject to ankle monitoring meant he was either a gang member or sex offender. The trial court instructed the jury to disregard the improper evidence, in keeping with its reliance on limiting instructions to vitiate the risk of unfair prejudice from the admission of relevant evidence.[10] There was weighty evidence supporting Medina's convictions—Doe's testimony, the corroborating ankle monitoring data, and the separately admissible portion of Brooks's statements.[11] And where the prosecution instead relied on Doe's uncorroborated (but uncontradicted) testimony that Medina possessed a firearm,[12] the jury acquitted Medina.

On this record, there are no exceptional circumstances to overcome our presumption that the jury followed the trial court's instructions. (See *People v. Daveggio*

---

[10] Medina's challenge to the timing of the instruction is also unpersuasive. Medina asserts that because the jury was not immediately instructed to disregard Nakayama's improper testimony, they would have heard the balance of the evidence assuming that Medina was a gang member or a sex offender. But Medina's own trial counsel indicated that the use of a delayed instruction was consistent with a defense strategy to avoid highlighting the improper testimony—conferring with the parties immediately after Nakayama's improper testimony the trial court invited the parties to propose a limiting instruction and there is no indication of any request to provide an instruction earlier in the trial. And the trial court had previously instructed the jury not to "form or express any opinion until the case is finally submitted to you." We have no more reason to suspect that the jury disregarded the trial court's instruction to defer forming opinions than that it disregarded the trial court's curative instruction.

[11] Consistent with our foregoing analysis, we are disregarding Brooks's identification of "Miguel" as her coconspirator.

[12] In context, Doe's wounds corroborate his testimony that Brooks had a firearm at the time she struck him. But there was no evidence corroborating Doe's testimony that Medina gave the firearm to Doe before Brooks took it from Doe.

17

*and Michaud* (2018) 4 Cal.5th 790, 861.) Medina calls our attention to *People v. Allen* (1978) 77 Cal.App.3d 924 (*Allen*). There, a rebuttal witness volunteered that the defendant was " 'on parole.' " (*Id*. at p. 934.) The prosecution did not intend to introduce the defendant's parole status, as the parole was the result of a prior juvenile conviction and therefore inadmissible as impeachment. (*Ibid*.) The trial court ordered the statement stricken and immediately admonished the jury to disregard it. (*Ibid*.) The *Allen* court explained that the "jury is presumed to have followed an admonition to disregard improper evidence particularly where there is an absence of bad faith" and that "only in the exceptional case" is " 'the improper subject matter' " incurable. (*Id*. at pp. 934–935.) Describing this as a fact-specific inquiry, the court held that it was "reasonably probable that a result more favorable to appellant would have been reached" in the absence of the improper testimony because it was "an extremely close case in which the jury had to make its fact determination based upon the credibility of the appellant and his witnesses and on the credibility of the prosecution's witnesses." (*Id*. at p. 935; see also *People v. Ozuna* (1963) 213 Cal.App.2d 338, 339, 341–342 [on retrial after a hung jury in a case with no eyewitnesses, admonition did not "probably" cure prejudice from improper evidence that defendant was an "ex-convict"].) Unlike *Allen*, Medina's convictions were not rendered in an extremely close case turning on the credibility of the prosecution's witnesses. (See *People v. Kocontes* (2022) 86 Cal.App.5th 787, 860 [distinguishing *Allen*].)

Medina's invocation of federal due process principles does not help him. "[T]he admission of evidence, even if error under state law, violates due process only if it makes the trial fundamentally unfair." (*People v. Partida* (2005) 37 Cal.4th 428, 436.) Consistent with our foregoing discussion, Nakayama's improper testimony did not make Medina's trial fundamentally unfair. (Cf. *People v. Albarran* (2007) 149 Cal.App.4th 214, 232, 230 [finding "rare and unusual" circumstances supporting finding of fundamental unfairness where trial court admitted gang evidence about "the threat to

18

police officers, the Mexican Mafia evidence and evidence identifying other gang members and their unrelated crimes" that "had no legitimate purpose in this trial"].)

## C. *Prior Strikes*

Medina contends that the trial court erred when it treated evidence of his prior convictions for violations of section 186.22, subdivisions (a) and (b)(1) as sufficient proof of prior strikes, arguing that Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill No. 333) (Stats. 2021, ch. 699) changed the requirements for a conviction and hence for a prior conviction to qualify as a strike.[13]  The parties acknowledge a split of appellate authority, and our Supreme Court has granted review to address whether Assembly Bill No. 333 amended the requirements of a true finding on a prior strike conviction.  (See *People v. Scott* (2023) 91 Cal.App.5th 1176, 1184 [holding that if prior conviction constituted a strike on the date of the prior conviction, it remains a strike today], review granted Sept. 27, 2023, S280776 (*Scott*); *People v. Aguirre* (2023) 96 Cal.App.5th 488, 491 [same], review granted Jan. 10, 2024, S282840 (*Aguirre*); *People v. Gonzalez* (2024) 98 Cal.App.5th 1300, 1311 [same], review granted Apr. 10, 2024, S286060 (*Gonzalez*); *People v. Fletcher* (2023) 92 Cal.App.5th 1374, 1379–1382 [holding that Assem. Bill No. 333 did not amend definition of serious felonies in the Three Strikes law], review granted Sept. 27, 2023, S281282 (*Fletcher*);[14] *People v. Farias* (2023) 92 Cal.App.5th 619, 651 [holding that trial court must evaluate whether

---

[13] It is undisputed that Medina's prior convictions under section 186.22 qualified as strikes when incurred.  The trial court did not evaluate whether the conduct underlying those prior convictions would violate section 186.22 as amended by Assembly Bill No. 333.

[14] In *Fletcher*, our Supreme Court included among the issues to be briefed and argued:  "Does Assembly Bill No. 333 amend the requirements for a true finding on a prior strike conviction (Pen. Code, §§ 667, subds. (b)–(i) & 1170.12, subds. (a)–(d)) and a prior serious felony conviction (Pen. Code, § 667, subd. (a)), or is that determination made on the 'date of that prior conviction'?  (See Pen. Code, §§ 667, subd. (d)(1) & 1170.12, subd. (b)(1).)"

prior conviction would be sound under current law to determine whether it remains a strike today], review granted Sept. 27, 2023, S281027 (*Farias*).)  Reviewing the " 'proper interpretation of [the] statute . . . de novo' " (*Gonzalez*, at p. 1306), we conclude that Assembly Bill No. 333 does not change the status of Medina's convictions as strikes.

### 1. *The Three Strikes Law*

" 'The Three Strikes law was "[e]nacted 'to ensure longer prison sentences and greater punishment for those who commit a felony and have been previously convicted of serious and/or violent felony offenses' [citation], [and] 'consists of two . . . nearly identical statutory schemes.' " ' " (*Gonzalez*, *supra*, 98 Cal.App.5th at p. 1306, review granted.)  One scheme was codified by the Legislature in March 1994 at section 667, the other was added by ballot initiative later that year at section 1170.12.  (*Ibid.*)

Under both schemes, a prior "strike" is a conviction for either a "violent felony" identified in section 667.5, subdivision (c) or a "serious felony" identified in section 1192.7, subdivision (c).  (§§ 1170.12, subd. (b)(1), 667, subd. (d)(1).)  Both schemes require the determination of whether a prior conviction is a serious or violent felony be "made upon the date of that prior conviction" (§§ 667, subd. (d)(1), 1170.12, subd. (b)(1)).  (*Gonzalez*, *supra*, 98 Cal.App.5th at pp. 1306–1307, review granted.) "Many courts have interpreted these provisions to mean that the question of whether a prior offense constitutes a strike is determined by whether the prior offense qualified as a strike at the time of the prior conviction."  (*Id*. at p. 1307.)  Serious felonies now and when Medina was convicted include "any felony offense, which would also constitute a felony violation of Section 186.22."[15]  (§ 1192.7, subd. (c)(28).)

---

[15] Both schemes are subject to "so-called 'lock-in' provisions, which set the effective date for determining qualifying offenses under the Three Strikes law." (*Gonzalez*, *supra*, 98 Cal.App.5th at p. 1307, review granted.)  For "all offenses committed on or after November 7, 2012, but before January 1, 2024, all references to existing statutes in subdivisions (c) to (g), inclusive, of section 667, are to those statutes as they read on November 7, 2012."  (§§ 667.1, subd. (a), 1170.125, subd. (a).)

20

**2.** ***Whether Conduct that No Longer Constitutes a "Serious" Felony Remains a Strike***

Following a majority of courts to address this issue, we hold that Medina's (1) gang-enhanced felony and (2) acts in furtherance of a criminal street gang both still qualify as prior serious felonies, because they qualified when he was convicted in 2015 and 2018, respectively. (See *Gonzalez*, *supra*, 98 Cal.App.5th at p. 1311, review granted; *Aguirre*, *supra*, 96 Cal.App.5th at p. 497, review granted; *Scott*, *supra*, 91 Cal.App.5th at p. 1182, review granted; see also *People v. Briceno* (2004) 34 Cal.4th 451, 456 (*Briceno*); but see *Farias*, *supra*, 92 Cal.App.5th at p. 652, review granted.)

In *Gonzalez*, the Fifth District analyzed both sides of the split of authority before holding, in line with the majority of appellate courts, that "Assembly Bill No. 333 does not change the status of a defendant's conviction as a prior strike. . . . [T]he status of defendant's prior conviction as a strike was fixed upon the date of his prior conviction." (*Gonzalez*, *supra*, 98 Cal.App.5th at p. 1311, review granted; see also *id*. at pp. 1308–1310.) The court explained that its holding was compelled by "[t]he plain language of the Three Strikes law." (*Id*. at p. 1311.)[16]

We find the *Gonzalez* court's analysis of the plain language of the statute persuasive. We considered a narrower reading of the determination clause as designed preserve a conviction as a strike only against post-judgment litigation (e.g., § 17, subd. (b)) or enumerated sentencing dispositions (§§ 667, subd. (d)(1)(A)–(D); 1170.12, subd. (b)(1)(A)–(D)). (See *Farias*, *supra*, 92 Cal.App.5th at p. 652, review granted.) But the determination clause of section 1170.12, subdivision (b)(1) speaks of "the

---

[16] The *Gonzalez* court also held that the lock-in provisions required it to refer to the serious felony list as it existed on November 7, 2012 because "defendant was convicted of his current offenses on or after" that date. (*Gonzalez*, *supra*, 98 Cal.App.5th at p. 1311, review granted.) The provisions lock the applicable version of the serious felony list based on the date "offenses" were "committed." (§§ 667.1, subd. (a), 1170.125, subd. (a).) But this distinction is immaterial to our analysis.

determination that a prior serious or violent conviction is a serious or violent felony," so the determination made upon conviction is its serious or violent character, as well as its felony status.

Medina urges us to instead adopt the reasoning in *Farias*, which directed the trial court to consider on remand the amendments wrought by Assembly Bill No. 333 in assessing on remand whether a 2009 violation of section 186.22 qualified as a prior strike for the purposes of a crime committed in 2018.[17]  (*Farias*, *supra*, 92 Cal.App.5th at pp. 627–628, 651, review granted.)  But the *Farias* court addressed only the language in "section 667, subdivision (d)(1), which states, '[t]he determination of whether a prior conviction is a prior felony . . . shall be made upon the date of that prior conviction and is not affected by the sentence imposed unless the sentence automatically, upon the initial sentencing, converts the felony to a misdemeanor,' " construing it narrowly to mean that the only "determination" addressed by the statute was whether the prior conviction was a felony or a misdemeanor conviction.  (*Farias*, at p. 652.)  We view the different wording of section 1170.12, subdivision (b)(1), like decisions interpreting section 667, subdivision (d) more broadly, as supporting the interpretation of the Three Strikes law adopted by the majority of courts. (See *Gonzales*, *supra*, 98 Cal.App.5th at pp. 1313–1314, fn. 8, review granted [declining to follow *Farias*]; § 1170.12, subd. (b)(1).)

*Strike* does not help Medina.  Strike was convicted, by guilty plea, in 2007 of violating section 186.22, subdivision (a).  (*Strike*, *supra*, 45 Cal.App.5th at p. 147.)  In 2017, the trial court treated the 2007 conviction as a prior strike.  (*Id*. at pp. 146, 148.)  But in 2012, the California Supreme Court had changed the interpretation of one of the elements of the 2007 offense.  (*Id*. at pp. 149–150; see also *Rodriguez*, *supra*, 55 Cal.4th

---

[17] The *Farias* court followed *People v. Strike* (2020) 45 Cal.App.5th 143 (*Strike*) in remanding the case due to the change in law wrought by *People v. Rodriguez* (2012) 55 Cal.4th 1125 (*Rodriguez*) after Miranda's 2009 conviction.  (*Farias*, *supra*, 92 Cal.App.5th at pp. 645–648, review granted.)

at p. 1128 (plur. opn. of Corrigan, J.); *id*. at p. 1139 (conc. opn. of Baxter, J.); *Gonzalez*, *supra*, 98 Cal.App.5th at pp. 1312–1313, review granted; *Scott*, *supra*, 91 Cal.App.5th at p. 1183, review granted; *Aguirre*, *supra*, 96 Cal.App.5th at p. 497, review granted.)  This change "rendered [the] pre-*Rodriguez* conviction inconclusive on its face as to whether it qualified as a strike." (*Strike*, at p. 150.)  But " ' "judicial decisions operate retrospectively," ' " so "when the Supreme Court interpreted section 186.22, subdivision (a), it declared not only what that section meant at that time, but what it had always meant—including when [Strike] suffered [his] prior conviction[]." (*Scott*, at pp. 1183, 1184; see also *Gonzalez*, at p. 1313.)  The *Strike* court's application of *Rodriguez* to a 2007 conviction thus defined the law as it existed at the time of conviction.  So *Strike* is consistent with the majority approach.

Medina invokes early cases holding that a conviction predating the Three Strikes law can qualify as a strike to support his proposition that convictions predating Assembly Bill No. 333 should not be treated as strikes.  (See *People v. Murillo* (1995) 39 Cal.App.4th 1298, 1307 [collecting cases].)  But Medina overlooks the "basic purpose of deterring recidivism" (*Gonzalez v. Superior Court* (1995) 37 Cal.App.4th 1302, 1311) that unifies those early cases and the majority approach to Assembly Bill No. 333.  Under the punitive logic of the Three Strikes law, the issue is that Medina " 'was found to have committed criminal conduct and did not thereafter reform.' " (*People v. Vargas* (2014) 59 Cal.4th 635, 638 (*Vargas*); see also *id*. at p. 641.)  In this legislative reasoning, it is not merely the persistence of criminal conduct but its persistence *despite* intervening adjudication as a strike offender and the criminal legal system's prior ministrations that warrants the severity of Three-Strikes sentencing.

Medina identifies no recent amendment to the Three Strikes law that calls for courts to use a more recent definition of a qualifying offense to a prior conviction.  The statutes require us to assess whether his offenses constituted strikes at the time of his convictions in 2015 and 2018—both offenses did under the applicable version of

23

section 1192.7. (See *Gonzalez*, *supra*, 98 Cal.App.5th at p. 1311, review granted; see also *Briceno*, *supra*, 34 Cal.4th at p. 456; §§ 667.1, subd. (a), 1170.125, subd. (a).)

We recognize the harshness of imposing a heightened punishment for older prior felony convictions where the same underlying conduct, if committed today, would not yield a strike. But the logic of the law is that each strike presents a "chance[] to reform [a person's] antisocial behavior," and failing to do so makes " 'current criminal conduct . . . more serious.' " (*Vargas*, *supra*, 59 Cal.4th at p. 638.) Medina was convicted of offenses that constituted prior strikes at the time, and he did not thereafter reform. We cannot say that the severity of the sentence imposed under our reading of the statute here is inconsistent with the intention of the Legislature and electorate in enacting the Three Strikes law.

Following the persuasive analysis of the majority of opinions addressing the issue, we agree with the trial court's determination that Medina's 2015 and 2018 convictions qualified as prior strikes.

### III.    DISPOSITION

The judgment is affirmed.

_____
LIE, J.

WE CONCUR:


_____
GROVER, Acting P. J.


_____
WILSON, J.


*People v. Medina*
H051661